628 P.2d 218

Fritz HOFFMAN and Fritz Frey,
Plaintiffs-Appellants,

v.

S V COMPANY, INC., formerly known as
Sun Valley Company, Inc., Sun Valley
Company, formerly known as Sun Valley
Resorts, Inc., James P. Conger and Does
I through X, Defendants-Respondents.

No. 13285.

Supreme Court of Idaho.

May 4, 1981.

Bruce J. Collier of Kneeland, Laggis, Korb, Collier & Benjamin, Ketchum, for plaintiffs-appellants.

Carl P. Burke of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for defendants-respondents.

SHEPARD, Justice.

This is an appeal from a judgment in favor of defendant-respondent Sun Valley Company, Inc. in an action brought by plaintiffs-appellants Hoffman and Frey seeking specific performance or damages based on respondent's refusal to convey real property pursuant to an alleged oral contract. We affirm.

The case concerns the negotiations and alleged contractual relationship between Hoffman-Frey and the Sun Valley Company involving the purchase and sale of a 1.64 acre undeveloped lot then owned by Sun Valley and commonly known as the "Ruud Mountain Property." Frey and Hoffman brought suit in contract to compel specific performance of the alleged agreement and in the alternative sought damages upon various other theories. Following trial, the district court concluded that while an oral understanding for the sale of the property existed, there was nevertheless failure to adequately comply with the statute of frauds and thus the agreement was unenforceable. The court also concluded that the equitable doctrines of part performance and estoppel were inapplicable.

The trial court made specific findings and conclusions relating to whether an oral contract existed between the parties and concluded that it was firmly convinced that an oral understanding was reached for the sale of the lot. Sun Valley contends on appeal that the parties had not reached a mutual agreement as to the terms of the transaction and, therefore, no contract existed. We disagree.

■ A distinct understanding common to both parties is necessary in order for a contract to exist. *Mitchell v. Siqueiros*, 99 Idaho 396, 582 P.2d 1074 (1978). *See Turner v. Mendenhall*, 95 Idaho 426, 570 P.2d 490 (1973). Here the sequence of events as reflected in the record and the findings of the trial court indicate the existence of an oral contract. Negotiations for the purchase of the property commenced during the fall of 1976 between Hoffman-Frey and one Conger, a representative of Sun Valley, who was authorized to sell the property but only after approval by an executive committee. Frey and Conger reached an understanding that $90,000 was an acceptable price whether paid in cash or paid 30% down, with the remainder to be paid pursuant to a five year installment note at 9¾% interest. That price had been approved by the executive committee. On January 22, 1977, Hoffman sent Conger a letter confirming their January 21 telephone conversation and stating, " * * * The agreement is as follows: Purchase price of $90,000 payable at 30% down with the balance to be payable quarterly at an annual interest rate of 9¾%." The letter specified as a condition precedent the City of Sun Valley's approval of a three lot subdivision of the property. The letter also contained additional terms, *i. e.*, subordination by Sun Valley of its note to a construction loan and a release of any one of the three lots upon full payment therefor. Enclosed was a check in the amount of $5,000, " * * * as a deposit which in the event we are turned down by the City of Sun Valley [for subdivision approval] shall be returned to us." The check carried the notation, "Escrow Ruud Mtn. Lots" and was made payable to the Sun Valley trust account. That check was deposited in the Sun Valley trust account.

Further discussions continued between the parties and Frey and Hoffman employed an engineer to perform the survey work necessary for the subdivision and paid therefor $436. That proposed subdivision was approved by the City of Sun Valley on March 21, 1977. Sun Valley Realty prepared a deed of trust, a deed of trust note, a seller's closing statement, and other loan documents which were delivered to Hoffman. Sun Valley attorneys prepared a lot sale agreement containing both subordination and deed release language and gave that document to Frey. None of the documents were executed by Sun Valley.

■ As aforesaid, the trial court found the above facts and concluded that a mutual understanding was reached. The findings are supported by substantial, albeit conflicting evidence and will not be disturbed on appeal. *Cougar Bay Co., Inc. v. Bristol*, 100 Idaho 380, 597 P.2d 1070 (1979). We agree with the lower court that those findings indicate the existence of an oral agreement between the parties. The district court further concluded that while there was an oral understanding for the sale of the property, there was failure to adequately comply with the statute of frauds and hence the oral agreement was unenforceable.

During the above recited events, Sun Valley had begun negotiations with another party for the sale of the entire resort assets, including the Ruud Mountain property and by mid-March, was actively involved in negotiations for such sale. On March 23, Conger telephoned Hoffman and urged completion of the deal as soon as possible. On April 8, Sun Valley sold all of its assets, including the Ruud Mountain lot. At that time neither the lot sale agreement nor any of the other closing documents had been signed by Frey or Hoffman. On April 10, Conger notified Hoffman that the property was no longer available and the $5,000 deposit was returned. On April 12, Frey and Hoffman signed the various documents, tendered the remainder of the down payment, and demanded that Sun Valley honor

the alleged contract. That tender was refused.

■ An agreement for the sale of real property is invalid unless the agreement or some note or memorandum thereof be in writing and subscribed by the party charged or his agent. I.C. § 9–505(5). Failure to comply with the statute of frauds renders an oral agreement unenforceable both in an action at law for damages and in a suit in equity for specific performance. 72 Am.Jur.2d *Statute of Frauds* § 285 (1974); 73 Am.Jur.2d *Statute of Frauds* § 513 (1974). *See DeLuca v. C. W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 391 A.2d 170 (1978).

■ The lot sale agreement was never signed by Sun Valley. Thus, for the oral agreement to be enforceable, there must exist a sufficient memorandum signed by the parties evidencing that agreement. The only document signed by both parties is the $5,000 deposit check (signed by payor Hoffman and endorsed by payee Sun Valley).[1] Although the majority of jurisdictions require that the memorandum be signed only by the party against whom enforcement is sought, this Court in *Houser v. Hobart*, 22 Idaho 735, 127 P. 997 (1912), has construed the Idaho statute to require both parties to a bilateral contract to sign the memorandum. *Houser* has consistently been reaffirmed by this Court. *Rouker v. Richardson*, 49 Idaho 337, 288 P. 167 (1930); *Kerr v. Finch*, 25 Idaho 32, 135 P. 1165 (1913). *Accord, C. Forsman Real Estate Co. v. Hatch*, 97 Idaho 511, 547 P.2d 1116 (1976).

■ Although no particular form of language or instrument is necessary to constitute a note or memorandum required by the statute, 72 Am.Jur.2d *Statute of Frauds* § 295 (1974), the essentials of the oral agreement must be contained in the writing(s). *Remlinger v. Dravo Corporation*, 94 Idaho 292, 486 P.2d 1005 (1971); *Blumauer-Frank Drug Co. v. Young*, 30 Idaho 501, 167

P. 21 (1917); *Houser v. Hobart, supra.* The memorandum must plainly set forth the parties to the contract, the subject matter thereof, the price or consideration, a description of the property and all the essential terms and conditions of the agreement. *Pettigrew v. Denwalt*, 431 P.2d 333 (Okla. 1967). *See, Gaskill v. Jacobs*, 38 Idaho 795, 225 P. 499 (1924).

We note first that the $5,000 check, standing alone, is clearly insufficient since the only notation carried on that check is the phrase "Escrow Ruud Mtn. Lots." Frey-Hoffman contend, however, that a sufficient memorandum may be pieced together from that check, the Hoffman letter transmitted in the same envelope as the check and the lot sale agreement prepared by Sun Valley.

There appear to be three doctrines under which various jurisdictions allow unsigned writings to be read together with a signed writing: express reference in a signed writing to an unsigned writing, implied reference between a signed and unsigned writing and the physical connection of an unsigned writing to a signed one. 72 Am. Jur.2d *Statute of Frauds* §§ 371–374 (1974); 4 Williston on Contracts §§ 580–583 (3d ed. 1961).

As well noted by the trial court, Idaho follows the doctrine that an unsigned writing may be considered as part of the memorandum only where express reference to it is made in a signed writing.

"In order to render an oral contract falling within the scope of the statute of frauds enforceable by action, the memorandum thereof must state the contract with such certainty that its essentials can be known from the memorandum itself, or by a reference contained in it to some other writing, without recourse to parol proof to supply them." *Blumauer-Frank Drug Co. v. Young*, 30 Idaho at 505, 167 P. at 21.

1. Although it is not necessary that the memorandum evidencing the oral agreement be signed with the intent to comply with the statute of frauds, the signature must be made with the declared or apparent intent of authenticating the writing relied upon as a memorandum. 37 C.J.S. *Statute of Frauds* § 203 (1943); 72 Am.Jur.2d *Statute of Frauds* § 362 (1974). It

would be questionable to assume that Conger, by directing a member of his staff to deposit the check in the trust account pursuant to regular office procedure, intended to authenticate the contents of the letter. In any event, the memorandum was insufficient to satisfy the statute for the reasons discussed below.

Here the $5,000 deposit check makes no express reference to either the Hoffman letter or the lot sale agreement.

Further, even if we allowed the Hoffman letter to be considered as part of a signed memorandum because of the physical association between the endorsed check and the letter, those writings would not satisfy the statute of frauds. The letter does not sufficiently set forth the credit terms of the oral agreement between the parties. This does not mean that the oral agreement is incomplete, but only that the written evidence of that agreement is insufficient to satisfy the statute of frauds. See Annot., 23 A.L.R.2d 164 (1952). The memorandum which evidences the verbal agreement must contain all the terms of that agreement. Otherwise, it cannot be enforced at law or in equity. *Dineen v. Sullivan*, 123 Mont. 195, 213 P.2d 241 (1950); 4 Williston on Contracts, § 575 (3d ed. 1961).

■ Here it is uncontested that the parties in their oral agreement intended that there be deferred payments. Where the parties intend deferred payments, the terms and conditions of the credit transaction must be set forth in the memorandum. *Tucson v. Farrington*, 396 Mich. 169, 240 N.W.2d 464 (1976); *Dineen v. Sullivan, supra; Monaco v. Levy*, 12 A.D.2d 790, 209 N.Y.S.2d 555 (1961); *Klipfel v. Brandenburger*, 156 N.W.2d 774 (N.D.1968); 72 Am. Jur.2d *Statute of Frauds* § 353 (1974). *Accord, Montanaro v. Pandolfini*, 148 Conn. 153, 168 A.2d 550 (1961); *Cohodas v. Russell*, 289 So.2d 55 (Fla.Dist.Ct.App.1974).

■ We agree that, as stated by the memorandum decision of the district judge, the terms of the oral agreement were reflected, although incompletely, in the Hoffman letter. That letter declared only "purchase price of $90,000 payable at 30% down with the balance to be payable quarterly at an interest rate of 9¾%." The letter does not evidence the maturity date of the note, a point of beginning for installment payments, the amount of installment payments, or if or how the note is to be secured. Hence, the letter is insufficient as a memorandum to take the verbal agreement out of

the statute of frauds. See *Moen v. Minzel*, 79 Idaho 228, 313 P.2d 1079 (1957).

Hoffman and Frey contend that even if there was no satisfaction of the statute of frauds, nevertheless the doctrines of part performance and equitable estoppel require enforcement of the admitted oral agreement. We disagree.

■ Sufficient part performance by a purchaser of real property removes the contract from the operation of the statute of frauds, *McMahon v. Auger*, 83 Idaho 27, 357 P.2d 374 (1960), and although the equitable doctrine of part performance is inapplicable to an action at law, *Allen v. Moyle*, 84 Idaho 18, 367 P.2d 597 (1961), satisfaction of the doctrine of part performance would entitle Hoffman and Frey to specific performance. See *Tew v. Manwaring*, 94 Idaho 50, 480 P.2d 896 (1971).

■ "The most important acts which constitute a sufficient part performance are actual possession, permanent and valuable improvements and these two combined." *Barton v. Dunlap*, 8 Idaho 82, 66 P. 832 (1901), quoted with approval in *Roundy v. Waner*, 98 Idaho 625, 570 P.2d 862 (1977). Here Hoffman and Frey contend that they exercised possessory rights upon the property by causing their surveyor to go upon the land, that their act of submitting a subdivision plat to the City of Sun Valley constituted an act of actual ownership and that by reason of said subdividing the property its value rose $55,000. It is clear that the City of Sun Valley's approval to subdivide the property was a condition precedent to the existence of any contract, either oral or written, and that Hoffman and Frey were willing to assume the expense and effort of securing subdivision as a part of negotiation costs. Hence, possession was neither actual nor in pursuance of the oral agreement. In addition, improvements made by a party and upon which they rely for part performance must be substantial in relation to the value of the property. *Roundy v. Waner, supra; Boesiger v. Freer*, 85 Idaho 551, 381 P.2d 802 (1963); *Anderson v. Whipple*, 71 Idaho 112, 227 P.2d 351 (1951). Here the cost of securing subdivision approval ($436)

is hardly substantial in relation to the value of the lot.

■ Hoffman and Frey also contend that the oral contract should be enforced under the principle of equitable estoppel. The elements of equitable estoppel have been enumerated by this Court as:

" * * * as related to the party estopped [they] are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." *Tew v. Manwaring*, 94 Idaho at 53, 480 P.2d at 899; *Boesiger v. Freer*, 85 Idaho at 559, 381 P.2d at 806–807.

It is contended that in mid-March of 1977, Conger was advised by Sun Valley that no individual properties were to be sold pending the possible sale of all of the assets of Sun Valley. It is asserted that Conger concealed the no sale policy from Hoffman and Frey and in reliance thereon they prejudicially altered their position.

■ Such assertion is contrary to the finding of the trial court that there was no knowingly false statement or concealment of a material fact. The evidence supports that finding.

We have examined appellants' remaining assignments of error and find them to be without merit.

Judgment of the trial court is affirmed. Costs to respondent.

BAKES, C. J., and McFADDEN and DONALDSON, JJ., concur.

BISTLINE, Justice, dissenting.

If the existing law is such in Idaho that the parties to this transaction, documented as it was, did not have a valid enforceable agreement, then the law is in need of re-evaluation. If our existing case law is inadequate to accommodate the business transactions made in today's business world, and if, as the Court's opinion concedes, our law is not in accord with that in a majority of jurisdictions, it simply does not do to continue to decide 1980 controversies based on what in 1912 was thought to be the better law to follow. If the last twenty years of legislation and judicial interpretation of legislation have pointed in one particular direction, it has to be the positive trend toward uniformity among the various fifty states of the Union. Such being an admitted state of affairs, it ill behooves this Court to accept a seventy year old decision without any thought that the earlier doctrine may be found outmoded and in need of change. And, whether that takes place or not, the very fact that we continue to be a Court out of step with both the times and other jurisdictions should at least require of us that we be extremely vigilant that our decisions are at least definitely within the demarcations of prior case precedent.

Today we pass appellate judgment on a controversy where the district court quite candidly observed that, notwithstanding his findings that the parties had a sufficient meeting of the minds so as to have entered into an oral contract for the sale and purchase of the 1.64 acre parcel commonly known to all as the "Ruud Mountain Property," he was precluded from granting relief to the buyers by the 1912 *Houser* case, and its progeny, as to which he declared his duty to follow and apply.[1] That he was not

1. The trial judge's memorandum decision prefaced his findings of facts and conclusions of law with these remarks:

"The plaintiffs have alleged and 'proved' that an oral agreement was reached for the sale of that land on January 21, 1977. The sole

happy about doing so is indicative that other sound judicial minds question the Court's unquestioning obedience to a philosophy that was not in harmony with the general view when first espoused and which was set out in a case where the Court's concern was more with the doctrine of mutuality of obligation than with the requirement of the statute of frauds that there be a sufficient memorandum signed by the party sought to be charged.[2] The doctrine of mutuality, however, is not of any moment here, as the buyers, seeking to charge the seller to comply with his duty to convey, are for certain signatories to the memorandum. Likewise the seller has signed the check which, if it is part and parcel of the memorandum, removes from the dispute the element of mutuality which is readily seen as the overriding concern of the fair-minded *Houser* court. A careful reading of the *Houser* opinion produces the belief that the Court simply was not going to order two farmers to sell their barley to a warehouseman who had not paid anything nor promised anything in return for their agreement. Such is not the case before us, but far more narrowly, the question presented here is

whether the two documents, the letter and the check, are together a sufficient memoranda as required by the statutory provisions. I believe that it is, even without at this time placing an interpretation on our statute which comports with modern times and other jurisdictions. Briefly as can be done, I demonstrate.

## I.

The buyers in their brief argue that the law allows that "an unsigned writing may be considered together with a signed writing if by express reference or sufficient internal evidence the unsigned writing is connected up with the signed writing." The Court's opinion, in that vein, expresses the same principle as the second of "three doctrines under which various jurisdictions allow unsigned writings to be read together with a signed writing": "Implied reference between a signed and unsigned writing," following which, however, the Court says that "Idaho follows the doctrine that an unsigned writing may be considered as part of the memorandum *only* where an express

defense of substance is I.C. 9–505(5), the Idaho statute of frauds:

In the following cases the agreement is invalid unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. (5) ... an agreement ... for the sale, of real property, or of an interest therein ... subscribed by the parties sought to be charged.

The statute of frauds requires that a contract for the sale of land (or a memorandum thereof) be reduced to writing and signed by the 'party to be charged.' The purpose of the statute is commonly thought to be the prevention of fraudulent assertions of oral contracts for the sale of land. Other objectives may be equally as important, however. The statute effectively insulates from litigation nearly all completely oral transactions involving the sale of land, thus contributing to the stability of title and marketability of land generally. The statute may also stimulate the use of formal written contracts, certainly an advisable practice for transactions as important as land sales. On the other hand, the statute can thwart legitimate contractual expectations. A party may generally repudiate a land sale agreement prior to its embodiment in written form. Courts have attempted to apply the statute to protect legitimate

contractual expectations without jeopardizing the statutory objectives. Hence, the doctrines of part performance and estoppel have been used to avoid harsh application of the statute. Similarly, the memorandum requirement has been liberally construed to allow sketchy memoranda of contractual agreements, to allow more than one document to constitute the memorandum, and to allow a subsequent memorandum to substitute an earlier agreement. In recent years, there has been a general trend toward greater protection of contractual expectations. This development has had the unhappy side-effect of muddying the law to the extent that the statute may now breed more litigation than it prevents. Certainly, the ascertainment of current Idaho law on the statute of frauds is difficult as the older cases may have been undercut by the recent trend of authority. This Court, however, cannot ignore Idaho Supreme Court cases regardless of their vintage."

2. The statute is couched in terms of "party charged." The statute is meaningless, however, until the situation actually arises where one party attempts to hold the other to his agreement. Hence I say "party *sought* to be charged," which I believe eminently correct.

reference to it is made in a signed writing." (Emphasis added.)

There does not seem to be, however, any evidence that such a doctrine is followed in Idaho. The Court labors under the belief that the case cited and quoted from, *Blumauer-Frank Drug Co. v. Young*, 30 Idaho 501, 167 P. 21 (1917), is a rejection of the implied reference doctrine—notwithstanding that neither the quotation nor any portion of the opinion gives mention to it.

As the opinion states, the quotation, which does not aptly fit the circumstances of the case, was a generality taken from 20 Cyc. 258 (1906). The rule there stated is that of "express reference," also today set forth in the Court's opinion as the first of three doctrines allowing unsigned writings to be taken together with signed writings in determining the existence of a sufficient memorandum.

The doctrine of "implied reference," relied upon by the buyers in this case, is apparently more in vogue in modern times than it was in earlier days. Nonetheless Cyc. gives it recognition, 20 Cyc. 263, in a short statement that separate writings evidently referring to the same transaction should be construed together, citing two cases for the proposition, *Strouse v. Elting*, 110 Ala. 132, 20 So. 123 (1896), and *Lecat v. Tavel*, 3 McCord 158 (S.C.1825). In both cases, those early scholars of the law were properly impressed with the singular fact that both writings bore the same date. Unfortunately, the court is not impressed that such is also true here, or with the fact that the two writings were delivered to the seller in the same envelope.

In *Strouse v. Elting, supra*, the court reasoned as follows:

"It is not necessary to a compliance with the statute of frauds that the contract of the parties be evidenced by a single writing. It has always been held sufficient if the contract is so clearly evinced by two or more instruments having reference to each other as to show they were parts of the same, and together constituted the contract of the parties. The object of the statute is to protect persons from fraud, and imposition by parol evidence, in respect to the contracts and obligations provided for by the statute. The general rule is that it is not competent to connect the several papers by parol, but the several instruments must be connected by references contained in the papers themselves.

"The rule is not absolute, and the following quotation from the case of *Beckwith v. Talbot*, 95 U.S. 289, was cited with approval in the case of *Jenkins v. Harrison*, 66 Ala. 345, 360: '*There may be cases in which it would be a violation of reason and common sense to ignore a reference which derived its significance from such proof. If there is ground for any doubt in the matter, the general rule should be enforced; but, when there is no ground for doubt, its enforcement would aid, instead of discouraging, fraud.*'

"This court then continues as follows: 'The implication of connection between the memorandum and the deed is almost irresistible, from their mere inspection, and there was no just objection to parol evidence of the contemporaneous facts and the circumstances surrounding the parties, showing that they were but parts of the same transaction.'" 20 So. at 126 (emphasis added).

It is readily believed that the court which in *Blumauer-Frank Drug Co. v. Young, supra*, accepted the one statement from Cyc., as it did, would also on a proper set of facts accept the other which is so well supported by the *Strouse* case. The facts before the Idaho Court, however, involved an unsigned order and, much, much later, two signed letters which obviously were not contemporary and could not possibly be said to give rise to the doctrine of implied reference, assuming that that doctrine was known to counsel and was relied upon.

Later statements by the Idaho courts are couched in much the same language as the *Strouse* court used. *See, e. g., Dunn v. Dunn*, 59 Idaho 473, 83 P.2d 471 (1938); *Roundy v. Waner*, 98 Idaho 625, 570 P.2d 862 (1977).

My research does not show that any Idaho court has ever rejected the doctrine of implied reference. Rather it appears to have never before been relied upon. Today it is, and the Court's opinion gives it short shrift indeed by passing it off with a case based upon express reference.

The doctrine of implied reference has been recently recognized, however. The exhaustive dissenting opinion of Justice McFadden in *Russell v. Russell*, 99 Idaho 151, 156, 578 P.2d 1082, 1087 (1978), deals with both express reference and implied reference, quoting from creditable authority which uses language similar to that used by the Alabama court in the *Strouse* case, and to that in the buyers contention urged upon us today. After noting that a separate writing can be incorporated into a contract by reference, and both writings relied upon to satisfy the statute of frauds, he quotes with approval this statement:

> "*The writings must contain* either an express reference to each other *or the internal evidence of their unity, relation or connection sufficient to make parol evidence of* their relation unnecessary." *Id.* at 157, 578 P.2d at 1088, quoting *Glockner v. Town*, 42 Haw. 485, 487 (1958) (emphasis added).

That which Justice McFadden wrote is substantiated by the text Am.Jur.2d, postdating the earlier work in Cyc. by some 70 years:

> "An express reference is not necessary to incorporate a separate writing in the memorandum. One writing may be connected with another either expressly or by internal evidence of subject matter and occasion. The relation of several papers relied on as together constituting a sufficient memorandum to satisfy the statute of frauds may appear either by express reference or from the nature of the contents. Separate writings which are related in subject matter may be read together to satisfy the requirement of the statute for a memorandum not only where both are signed by the party to be charged, but also where only one of them is so signed, if they are so connected that the signature appearing upon the one can be said to authenticate the other one, which is unsigned. Under such circumstances it is deemed that there is in fact a reference in the one instrument to the other. As some authorities declare, the reference required to incorporate the other paper in the memorandum is implied, or, as otherwise stated, there is an incorporation by necessary inference." 72 Am.Jur.2d Statute of Frauds § 374 (1974).

Such being the state of the law, it remains to be determined if the two writings fall within the doctrine of implied reference.

As the Court's opinion recites, the letter and check were dated the same date, and both the check and the letter were signed. The check was the only document signed by the seller. The letter refers to an enclosed check[3] and refers to the Ruud Mountain property. The check refers to the "Ruud Mtn. lots." Such being the state of the evidence, it requires " 'a violation of reason

---

3. The letter reads as follows:

"Dear Phil,

"This letter will confirm our phone conversation regarding the acreage referred to as the Ruud mountain property. The agreement is as follows: Purchase price of $90,000, payable at 30% down with the balance to be payable quarterly at an annual interest rate of 9¾%. It is further understood that Sun Valley Company will agree to subordinate in the event we wish to obtain a construction loan to build one or more houses on the subject property. It is further understood that Sun Valley Company will provide a deed release upon payment in full for any one of the three lots in the event we wish to sell them. Further this agreement is subject to approval of the City of Sun Valley to subdivide the subject acreage into (3) three lots of more or less equal size.

"Enclosed is a check in the amount of $5000.00 as a deposit which in the event we are turned down by the City of Sun Valley shall be returned to us. This agreement shall be subject to the approval of Fritz Frey no later than February 15th 1977.

"As you know Fritz is in Europe and is expected to return around the end of January. We will contact you upon his return to resolve the deal.

"I hope you get some snow soon!

Regards,
Fritz."

and common sense to ignore a reference which derived its significance from such proof.... *The implication of connection* between the memorandum [here the letter] and the deed [here the check] *is almost irresistible, from their mere inspection....'"* *Strouse, supra* at 126 (emphasis added) (quoting *Jenkins v. Harrison,* 66 Ala. 345, 360 (1880)). Or, using the language quoted by Justice McFadden in *Russell v. Russell, supra,* the two writings on their face do "contain ... internal evidence of their unity, relation, or connection sufficient to make parol evidence of their relation unnecessary." *Id.* at 157, 578 P.2d at 1088.

Very little more need be said. Either the viewer of the two documents is drawn to the implication of reference by the internal evidence of their unity and connection, or the viewer is not. To my mind it allows of but one conclusion.

Even were the seller to claim that there was no connection between the two documents (which here is not the case), no reasoning mind could accept such a proposition as against that which is disclosed on the face of the two documents.

## II.

The Court's opinion also finds another ground upon which the seller's refusal to honor the transaction can be upheld. It is said that the letter is insufficient in that it does not evidence the schedule on which the note would be paid, or how it would be secured. Anyone who reads the letter will find this statement both in error and untenable, and I briefly explain why.

In the first place the seller here owns the property, and it is the seller who has title to it, not the buyer. There is not much better security in real estate transactions than the retaining of title until the purchase price has been paid.

In the second place, the letter does not mention the word "note." *See* note 3, *su-*

*pra.* The purchase terms are quite clearly $90,000 for the property, with a down payment of 30%. $5,000 was sent (and accepted) as earnest money for application on the down payment.

It is readily apparent that the down payment would be payable upon the city giving its approval to subdividing the property into three lots. The $60,000 balance would be payable in quarterly payments, which is not difficult to mathematically compute and the unpaid principal would accrue interest at a rate of 9¾% per annum. It is at most arguable whether the interest also would be paid quarterly—but there being nothing to the contrary, seller could insist on it. Four payments would mean four payments. The letter even went so far as to spell out a deed release "upon *payment in full* for any one of the three lots in the event we wish to sell them" (emphasis added). Indeed, little, if anything, was left to the imagination of the parties. A lawyer might have used more paper and more whereases, but could not have better embodied the salient terms.

It is true that the agreement of sale *later* drawn by seller provided that the $63,000 balance of the purchase price would not be paid quarterly, but would be paid monthly, and the time in which to do so was extended to sixty months. It was at this point, as evidenced by the agreement drawn by seller, that at closing the buyers became obligated to pay the down payment, receive a deed, and sign a note and trust deed—apparently to satisfy the bank that had agreed to buy the paper. None of this would be unusual. But the initial agreement was simply that stated in the letter, to which the seller acceded in signing the check and thereby accepting the money on the terms expressed in the letter.[4] From that point on the parties could, and apparently did, agree upon changes and refinements to their original agreement.

---

**4.** I see no merit to footnote 1 in the Court's opinion wherein it suggests that Conger in accepting the check did not authenticate the contents of the letter. On the contrary, the trial court stated specifically in his findings of fact and conclusions of law that "[t]he testimony

and conduct of Mr. Conger indicates a 'grumbling acceptance' but an acceptance nevertheless."

A reading of Mr. Conger's testimony shows that from the time he received the letter and the check, he considered that an agreement had

Concluding, I submit only that Idaho law in this field again takes a turn for the worse. In 1912 it was, perhaps, not too big a problem that Idaho courts took a stance not in accord with the majority.

Today is 1981, and we are asked to consider and apply the doctrine of implied reference. In the Court's opinion it is considered only to the extent that it is mentioned, and passed upon and rejected by resort to an inapplicable opinion rendered at an early time when the doctrine was practically unknown. We are, I fear, out of touch with reality. The transaction entered into in this case was typical of a good many, if not most, transactions taking place on a regular basis. A final agreement was reached over the telephone, and one is not hallucinating to surmise that it ended with one telling the other to send a check and a letter confirming the agreement reached. And it was done, and would have stayed done except for a change in ownership, and a new seller reneging on the hope that Idaho case law would allow an escape from an obligation when escape was not generally available elsewhere. The trial court was, of course, as we are not, bound to accept Idaho case law as it was or seemed to be.

been reached, although he was not pleased at some of the provisions which he said appeared for the first time in the letter. He felt that those items were workable, and constantly pressured the buyers to live up to the agreement—mainly so that Janss (seller) would get the money from the down payment and by assigning the paper on the balance.